**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BIOCLINICA, INC.,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. _________________** |
| **v.** | ) | |
| **MARK HUTSON,** | ) | |
| **Defendant.** | ) | |

**VERIFIED COMPLAINT**

## I. NATURE OF THE ACTION

1. Defendant Mark Hutson ("Mr. Hutson") is a highly-compensated, former Senior Account Executive of Business Development ("Sr. Account Executive"), for Plaintiff BioClinica, Inc. ("BioClinica"). BioClinica is a leader in the provision of clinical trial resources, such as medical imaging services, clinical trial management, and cardiac safety services, to pharmaceutical and biotechnology companies. As a Sr. Account Executive, Mr. Hutson was responsible for marketing and selling BioClinica's services to existing and prospective customers.

2. On June 12, 2020, Mr. Hutson announced he was resigning from BioClinica, effective June 26, 2020. Upon learning of his resignation, BioClinica asked him about his future work plans. In response, Mr. Hutson insisted he did not have any immediate plans; he wanted to "step away" for a while and "de-stress." But BioClinica began to hear rumors that Mr. Hutson was going to work for a direct competitor—eResearch Technology, Inc. ("ERT"). BioClinica confronted Mr. Hutson with the rumor and he denied it, again telling BioClinica he was "stepping away."

3. Despite Mr. Hutson's claim he was not going to work for ERT, BioClinica reminded him, on two separate occasions, he was bound by restrictive covenant agreements, the terms of which prohibited him from competing against, or soliciting clients of, BioClinica for one year after his termination. These covenants also prohibited Mr. Hutson from using or disclosing confidential information relating to BioClinica's customer base. Mr. Hutson confirmed he understood the restrictions and would always intend to abide by them.

4. June 24, 2020 was Mr. Hutson's last day of work with BioClinica. Not even two weeks later, on Sunday, July 5, 2020, Mr. Hutson text-messaged his former BioClinica bosses, telling them he was starting work at ERT later that week in a medical solutions position, where he reviews account portfolios and provides input to business development representatives who sell ERT's services directly to clients. In other words, he was not "stepping away" and, instead, had taken a business development role with a direct competitor. Worse yet, within a week of starting his new role, Mr. Hutson contacted at least one BioClinica client to solicit business for ERT. This behavior is a clear (and seemingly willful) violation of Mr. Hutson's post-employment obligations to BioClinica.

5. Because it cannot sit idly by in the face of such brazen disregard of binding contractual obligations, BioClinica files suit against Mr. Hutson. BioClinica seeks to hold him to his contractual commitments. BioClinica asserts claims for breach of contract and misappropriation of trade secrets and seeks to enjoin Mr. Hutson's unlawful conduct both temporarily, preliminarily, and permanently. Because Mr. Hutson's employment with ERT is in its infancy, and BioClinica does not yet know the full extent of his and/or ERT's wrongful conduct, BioClinica reserves the right to amend the allegations contained in this Verified Complaint to conform to the evidence it discovers.

## II. THE PARTIES

1. BioClinica is a corporation incorporated under the laws of the State of Delaware with its current principal place of business in Princeton, New Jersey. Before on or about April 2018, BioClinica's principal place of business was Doylestown, Pennsylvania.

2. Defendant Mark Hutson ("Hutson") is a citizen of the State of Illinois, residing in Lindenhurst, Illinois.

## III. JURISDICTION AND VENUE

3. This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship amongst the parties and the amount in controversy exceeds the sum of $75,000.00.

4. Under 28 U.S.C. § 1391(b), venue is proper in this district because Mr. Hutson resides in Lindenhurst, Lake County, Illinois, which is located within this district. *See* 28 U.S.C. § 93.

## IV. FACTUAL ALLEGATIONS

5. BioClinica is a global leader in scientifically-driven services and technology-enabled solutions in clinical research. It provides a large platform of technology-enabled services to clients engaged in clinical research. These services include, but are not limited to, managing the medical imaging process throughout clinical trials and designing and supporting studies that require cardiac safety monitoring.

6. BioClinica employs a department of business development professionals to sell and monitor growth of its clinical trial services to existing and prospective clients.

7. BioClinica attributes its global success, in part, to years of building its brand and years of cultivating relationships with pharmaceutical and biotechnology companies.

8. The result of these business development efforts is a comprehensive, password-protected client management system ("CMS") that contains information on clients and prospective clients, including key contact information, a pipeline of prospective opportunities, market analyses, detailed pricing information and strategies, and notes about customer preferences and prior dealings (hereafter, "Proprietary Client Information").

9. Competition within the clinical trial service industry is fierce and highly sensitive to price, quality, and service level.

10. As a result, BioClinica's relationship with clients and prospective clients is integral to BioClinica's ability to market and sell its services.

11. BioClinica has therefore taken steps to protect its Proprietary Client Information by, among other things, limiting access to its CMS, password-protecting its CMS, and requiring business development professionals to sign restrictive covenant agreements as a condition of their employment.

**A. <u>Mr. Hutson's Employment with BioClinica</u>**

12. In February 2018, BioClinica offered Mr. Hutson a job as an Account Vice President of Business Development, now referred to as a Sr. Account Executive. He promptly accepted BioClinica's employment offer and, on or about March 5, 2018, he started work at BioClinica at an annual base salary of approximately $110,000 plus commissions and bonus, which could result in him earning substantially more. For example, in 2019, Mr. Hutson earned well over three-times his base salary in total compensation

13. As a condition of his hire and in consideration of his employment, BioClinica required Mr. Hutson to execute a Restrictive Covenant Agreement and a Confidentiality Agreement. Mr. Hutson signed both Agreements on February 9, 2018. *See* Exhibits 1 and 2.

14. As a Sr. Account Executive, Mr. Hutson's primary responsibilities included identifying business opportunities, developing and securing new business, and maintaining relationships with existing clients. He was also responsible for maintaining technical knowledge about BioClinica's products and services.

15. To aid Mr. Hutson in performing these duties, BioClinica granted him password-protected access to BioClinica's CMS, which contained Proprietary Client Information.

16. In addition, to aid Mr. Hutson in selling BioClinica's services, BioClinica required him to participate in company-sponsored trainings designed to provide him with technical knowledge about the services he was responsible for selling.

**B. BioClinica's Efforts to Protect its Proprietary Client Information**

17. As previously mentioned, as a condition of and in consideration of employment with BioClinica, Mr. Hutson also signed a Restrictive Covenant Agreement. *See* Ex. 1.

18. Section 2 of the Restrictive Covenant Agreement provides:

> Non Competition. During the period of my employment with the Company and **for a period of one (1) year thereafter, I will not, either for myself or any other person or entity, directly or indirectly carry on or engage in any business competitive with that of the Company as of the date of termination of my employment** by the Company in any state or commonwealth of the United States or any country of the world in which the Company or any affiliate of the Company carries on or engages in the business of the Company. The business of the Company for these purposes shall include, without limitation, such specific technologies or products in which the Company shall, during the period of my employment, have initiated significant plans to develop. Carrying on or engaging in business on my part shall include the following activities: engaging in, working with, having an interest or concern in, advising, lending money to, guaranteeing the debts or obligations of, or permitting one's name to be used in connection with, an enterprise or endeavor, either individually, in partnership or in conjunction with any person or persons, firms, associations, companies or corporations, whether as a principal, agent, shareholder, employee, officer, director, partner, consultant or in any manner whatsoever (it is being understood

> that I will retain the right to invest in or have an interest in entities traded on any public market or offered by any national brokerage house, provided that such interest does not exceed five percent (5%) of the voting control of that entity).
>
> Non-Solicitation. During the period of my employment with the Company and **for a period of one (1) year thereafter, I will not, either for myself or for any other person or entity, directly or indirectly** (i) solicit, induce or attempt to induce any employee of the Company or of any affiliate of the Company to terminate his or her employment with the Company or such affiliate or (ii) **solicit or contact any customer or potential customer of the Company or any affiliate of the Company.**

[*See* Ex. 1 (emphasis supplied).]

19. Mr. Hutson also executed a Confidentiality Agreement as a condition of and in consideration of employment with BioClinica. *See* Ex. 2.

20. Section 4 of that Confidentiality Agreement provides:

> Protection of Confidential Information of the Company. I understand that my work as an employee of the Company creates a relationship of trust and confidence between myself and the Company. During and after the period of my employment with the Company, I will not use or disclose or allow anyone else to use or disclose any "Confidential Information" (as defined below) relating to the Company, its products, suppliers or customers except as may be necessary in the performance of my work for the Company or as may be authorized in advance by appropriate officers of the Company. **"Confidential Information" shall include** innovations, business strategies, financial information, forecasts, personnel information, **customer lists**, trade secrets and any other non-public technical or business information, whether in writing or given to me orally, which I know or have reason to know the Company would like to treat as confidential for any purpose, such as maintaining a competitive advantage or avoiding undesirable publicity. I will keep Confidential Information secret and will not allow any unauthorized use of the same, whether or not any document containing it is marked as confidential. These restrictions, however, will not apply to Confidential Information that has become known to the public generally through no fault or breach of mine or that the Company regularly gives to third parties without restriction on use or disclosure. Upon termination of my work with the Company, I will promptly deliver to the Company all documents and materials of any nature pertaining to my work with the Company and I will not take with me

> any documents or materials or copies thereof containing any Confidential Information.
>
> [*See* Ex. 2 (emphasis supplied).]

21. Both Agreements provide Pennsylvania law governs their respective terms and construction. *See* Ex. 1 at ⁋ 6; Ex. 2 at ⁋ 10.

22. Both Agreements also state, "in the event of a breach of threatened breach of this Agreement by me [Mr. Hutson] the Company may suffer irreparable harm and will therefore be entitled to injunctive relief to enforce this Agreement." *See* Ex. 1 at ⁋ 5; Ex. 2 at ⁋ 9.

23. If Mr. Hutson had not signed the Restrictive Covenant Agreement and/or Confidentiality Agreement, BioClinica would not have: (a) employed him as a Sr. Account Executive; (b) given him access to Proprietary Client Information: or (c) allowed him to trade on BioClinica's goodwill.

## C. Mr. Hutson's Post-Employment Conduct

24. On June 12, 2020, Mr. Hutson told BioClinica he was resigning his employment effective June 26, 2020. He did not provide any information about his plans following his resignation, insisting he was "stepping away" for a time.

25. Shortly after he gave notice of his resignation, BioClinica heard rumors Mr. Hutson was going to work for ERT. As a result, his supervisor, Nicole Risnychok, Vice President Business Development - North America, confronted Mr. Hutson and asked him if he was in fact going to work for ERT. He told her no, saying he had no plans to work and was truly "stepping away" for a while.

26. On June 18, 2020, at the request of BioClinica's President, Tom Ruddy, BioClinica's Interim Chief Human Resources Officer, met with Mr. Hutson to discuss issues he had raised regarding some of BioClinica's business development procedures. During that

conversation, Mr. Ruddy asked Mr. Hutson where he planned to work upon leaving BioClinica. Mr. Hutson told Mr. Ruddy he did not have a job lined up and planned to take time off because he was "burnt out." Mr. Hutson said he was in a comfortable financial position, which would allow him to take time off work.

27. Mr. Ruddy responded by reminding Mr. Hutson that when he did decide to return to work, he was party to agreements with BioClinica that prevented him from engaging in a competitive business or soliciting BioClinica customers or clients for a one-year period. Mr. Hutson told Mr. Ruddy he was aware and intended to comply with his contractual obligations.

28. June 24, 2020 was Mr. Hutson's last day worked, although BioClinica continued to pay him through June 26, 2020.

29. Initially, BioClinica did not hear any word from or about Mr. Hutson. On July 5, 2020, however, a mere nine days after he last worked for BioClinica (and seven days after BioClinica last paid him), Mr. Hutson text-messaged Ms. Risnychok and Eric Forsthoffer, BioClinica's Senior Vice President of Global Business Development, notifying them he had accepted a job at ERT and was starting that same week.

30. Just like BioClinica, ERT provides clinical trial management, medical imaging, and cardiac safety services to pharmaceutical and biotechnology companies. ERT is a global company with office across the world, and a direct competitor of BioClinica.

31. On information and belief, ERT employs Mr. Hutson in an imaging solutions position, where he serves as a liaison between ERT and customers/potential customers of ERT's medical imaging and cardiac safety services. He is responsible for generating new business leads, managing the business development process, and providing direct operational and scientific input and support to ERT's business development professionals. This position permits

Mr. Hutson to compete directly against BioClinica because he is able to influence ERT business development representatives to call on BioClinica clients or prospective clients, and he can use its Proprietary Client Information, such as operational, pricing, and scientific strategies, to provide input on the proposals those representatives submit to clients or prospective clients.

32. There is no doubt Mr. Hutson was aware of his obligations under the Restrictive Covenant Agreement and Confidentiality Agreement when he accepted and assumed his job at ERT because both Ms. Risnychok and Mr. Ruddy reminded him of them.

33. On information and belief, Mr. Hutson is performing business development services for ERT and has similar business development responsibilities to those he had with BioClinica. In fact, according to one existing BioClinica customer, on July 13, 2020, Mr. Hutson contacted him on ERT's behalf. In doing so, Mr. Hutson tried to trade on BioClinica's goodwill by referencing BioClinica and the name of a Vice-President of Business Development who Mr. Hutson knows has had a longstanding relationship with the account.

34. Given the similarity of certain services offered by ERT and BioClinica, Mr. Hutson cannot possibly perform his current job at ERT without using and/or disclosing BioClinica's Proprietary Client Information in performing his duties for ERT. In fact, as explained above, he has already done so. He used BioClinica's Proprietary Client Information to contact a BioClinica client on ERT's behalf, using the name of a BioClinica colleague to facilitate a discussion with the client.

35. Moreover, given Mr. Hutson's complete disregard of his contractual obligations to date, it is inevitable Mr. Hutson will continue to use and/or disclose Proprietary Client Information and/or trade on BioClinica's good will to solicit BioClinica clients on behalf of ERT.

36. As a result of Mr. Hutson's ongoing violation of his Restrictive Covenant Agreement and Confidentiality Agreement, BioClinica is suffering and will continue to suffer harm that cannot be measured in monetary damages, including, but not limited to, loss of goodwill, damage to client relationships, and disclosure of confidential and proprietary client information.

37. Although BioClinica cannot presently calculate the precise value of the harm caused by Mr. Hutson's actions in contravention of his legal and contractual obligations, it has no doubt that it exceeds $75,000.00.

**COUNT I**
**BREACH OF RESTRICTIVE COVENANT AGREEMENT**

38. BioClinica incorporates the averments of the foregoing paragraphs by reference, as if set forth herein.

39. Mr. Hutson entered into the Restrictive Covenant Agreement with BioClinica for good and valuable consideration.

40. Mr. Hutson had a duty to abide by the non-solicitation and non-competition provisions in his Restrictive Covenant Agreement.

41. Mr. Hutson has breached his Restrictive Covenant Agreement by, among other things, accepting employment with ERT in a capacity that competes with BioClinica.

42. Based on the actions described above, among others, Mr. Hutson has breached his Restrictive Covenant Agreement by, among other things, soliciting current BioClinica clients on behalf of ERT.

43. There is a real and substantial risk that Mr. Hutson has and/or will commit further violations of the Restrictive Covenant Agreement unless his conduct is enjoined.

44. As a direct and proximate result of Mr. Hutson's wrongful conduct, BioClinica has sustained and will continue to sustain immediate and irreparable harm and injury for which it has no adequate remedy at law.

45. In addition to the irreparable injury described above, as a direct and proximate result of Mr. Hutson's wrongful conduct, BioClinica has suffered and/or will suffer actual and/or consequential damages including loss of competitive business advantage, opportunity, and/or expectancy.

**COUNT II**
**BREACH OF CONFIDENTIALITY AGREEMENT**

46. BioClinica incorporates the averments of the foregoing paragraphs by reference, as if set forth herein.

47. Mr. Hutson entered into the Confidentiality Agreement with BioClinica for good and valuable consideration.

48. Mr. Hutson had a duty to abide by the confidentiality provision and refrain from disclosing or using BioClinica's Proprietary Client Information for the benefit of any person or entity other than BioClinica.

49. Based on the actions described above, on information and belief, Mr. Hutson has breached the terms of his Confidentiality Agreement by, among other things, using Proprietary Client Information in an attempt to solicit a current BioClinica client on ERT's behalf.

50. Given the similarity of certain services offered by ERT and BioClinica, Mr. Hutson cannot possibly perform his current job at ERT without using and/or disclosing BioClinica's Proprietary Client Information.

51. Moreover, given Mr. Hutson's complete disregard of his contractual obligations to date, it is inevitable Mr. Hutson will continue to use and/or disclose Proprietary Client

Information and/or trade on BioClinica's good will to solicit BioClinica clients on behalf of ERT.

52. There is a real and substantial risk Mr. Hutson has and/or will commit further violations of the Confidentiality Agreement unless his conduct is enjoined.

53. As a direct and proximate result of Mr. Hutson's wrongful conduct, as described herein, BioClinica has sustained and will continue to sustain immediate and irreparable harm and injury for which it has no adequate remedy at law.

54. In addition to the irreparable injury described above, as a direct and proximate result of Mr. Hutson's wrongful conduct, BioClinica has suffered and/or will suffer actual and/or consequential damages including loss of competitive business advantage, opportunity, and/or expectancy.

**COUNT III**
**MISAPPROPRIATION OF TRADE SECRETS**
**IN VIOLATION OF THE ILLINOIS TRADE SECRETS ACT**
**(765 ILCS 1065/1, *et seq.*)**

55. BioClinica incorporates the averments of the foregoing paragraphs by reference, as if set forth herein.

56. During his employment with BioClinica, Mr. Hutson had access to and did access BioClinica's Proprietary Client Information, including, but not limited to, customer lists, which included customers' order histories, prospective projects, preferences, key contact information, pricing history, long-term sales strategies, and information on successful and unsuccessful bids for business. Mr. Hutson also received specialized training and confidential information geared towards successfully marketing and selling BioClinica's services to pharmaceutical and biotechnical companies. These are trade secrets.

57. BioClinica created, composed, and developed the Proprietary Client Information at great expense, and the Proprietary Client Information has independent economic value, which is derived from not being generally known to, and not readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

58. BioClinica has made reasonable efforts to maintain the confidential nature of its Proprietary Client Information by, among other things, limiting access to and password-protecting the CMS and requiring business development professionals to sign restrictive covenant agreements as a condition of employment and prior to receiving access to the CMS.

59. Since joining ERT mere weeks ago, Mr. Hutson has already misappropriated BioClinica's Proprietary Client Information to contact a BioClinica client on behalf of ERT.

60. BioClinica has not consented, either expressly or implicitly, to Mr. Hutson's disclosure and/or use of its Proprietary Client Information on ERT's behalf.

61. Given Mr. Hutson's blatant and willful use of the Proprietary Client Information mere weeks after resigning from BioClinica, it is inevitable he will continue to use or disclose the Proprietary Client Information to solicit BioClinica customers on ERT's behalf.

62. In addition to the irreparable injury described above, as a direct and proximate result of Mr. Hutson's wrongful conduct, BioClinica has suffered and/or will suffer actual and/or consequential damages including loss of competitive business advantage, opportunity, and/or expectancy.

## PRAYER FOR RELIEF

**WHEREFORE**, BioClinica demands entry of a judgment against Mr. Hutson providing for the following relief:

A. A preliminary and permanent injunction enjoining Mr. Hutson from working for ERT in a competitive capacity for a period of one-year commencing on the date of entry of an Order awarding said injunctive relief;

B. A preliminary and permanent injunction enjoining Mr. Hutson from soliciting, directly or indirectly, any customers or prospective customers of BioClinica for a period of one-year commencing on the date of entry of an Order awarding said injunctive relief;

C. A preliminary and permanent injunction enjoining Mr. Hutson from using and/or disclosing BioClinica's Proprietary Client Information on behalf of any entity or person other than BioClinica;

D. An award of counsel fees, interest, and costs of suit; and,

E. For such other and further relief as the Court may deem just and proper.

Dated: July 23, 2020

Respectfully submitted,

By: */s/ James N. Boudreau*

James N. Boudreau (PA SBN: 77891)
Caroline R. Robb (*pro hac vice* app. forthcoming)
**GREENBERG TRAURIG, LLP**
1717 Arch St., Suite 400
Philadelphia, PA 19103
Tel: (215) 988-7800
Email: boudreauj@gtlaw.com
Email: robbc@gtlaw.com

Tiffany S. Fordyce, Esq. (ID No. 235063)
**GREENBERG TRAURIG, LLP**
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Tel: (312) 456-8400
Email: fordycet@gtlaw.com

*Attorneys for Plaintiff BioClinica, Inc.*

**VERIFICATION**

I, Eric Forsthoffer, being of full age, hereby certifies as follows:

1. I am the Senior Vice President ("SVP") of Global Business Development, and I am authorized to make this verification on behalf of Plaintiff BioClinica, Inc.

2. I have reviewed the foregoing Verified Complaint and certify that the facts stated therein are true and correct to the best of my knowledge. This verification is based on my personal knowledge, as well as knowledge and information provided to and obtained by me, in my capacity as the SVP of Global Business Development.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 23-Jul-2020 | 4:36 PM EDT

DocuSigned by:
Eric Forsthoffer
Signer Name: Eric Forsthoffer
Signing Reason: I approve this document
Signing Time: 23-Jul-2020 | 4:36 PM EDT
E451C5B96C8B47879C58D8F98AAFE046

Eric Forsthoffer, on behalf of
Plaintiff BioClinica, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 23, 2020, I caused a copy of the foregoing *Verified Complaint* to be filed with this Court's ECF system and served on Plaintiff Mark Hutson via First Class Mail at 1801 Prairie Ridge Circle, Lindenhurst, Illinois 60046.

/s/ *Caroline R. Robb*